## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATHAN NAHIKIAN<br>3818 Davis Place<br>Unit #103<br>Washington, DC 20008 | )<br>)<br>)<br>)<br>)<br>) | |
| Plaintiff,<br>v. | )<br>)<br>) | No._____ |
| E.I. DUPONT DE NEMOURS<br>& COMPANY<br>1007 Market St.<br>Wilmington, DE 19898 | )<br>)<br>)<br>)<br>) | |
| Defendant. | )<br>) | |

## COMPLAINT

Plaintiff, Nathan Nahikian, by his undersigned attorneys, brings this class action on behalf of himself and all others similarly situated against the Defendant E.I. DuPont De Nemours & Company, and alleges the following:

### INTRODUCTION

1.    This class action seeks damages and declaratory and injunctive relief on behalf of Plaintiff and a class of persons who purchased cookware coated with the E.I. DuPont De Nemours & Company ("DuPont")'s Teflon® product in the District of Columbia.

2.    DuPont has engaged in unfair and deceptive trade practices by making fraudulent, false, misleading, and deceptive representations, and corresponding material omissions, about the purported safety of a cookware coating product manufactured and sold by DuPont under the common name "Teflon®." DuPont knew or should have

known, but failed to disclose to the consuming public, that cookware coated in DuPont's Teflon® product, when used as intended under normal everyday circumstances, can release harmful and dangerous substances, chemicals, and particulates, including toxins and likely human carcinogens, exposing consumers to potentially serious health risks.

3.    DuPont designed, manufactured, distributed, sold, advertised and marketed the Teflon® product, using these unfair and deceptive misrepresentations and omissions, when it knew or should have known - based on, *inter alia*, studies that DuPont itself conducted - that Teflon® contains numerous substances, including a chemical compound called PFOA, which are dangerous and harmful to the public, which can be released when cookware coated with Teflon® product is used as intended, which have bioaccumulative and biopersistent properties, and which can pass from mothers to their children *in utero*.

4.    Consumers, including Plaintiff and the members of the Class, purchased cookware coated with DuPont's Teflon® product, without knowing of the risks and dangers that Teflon® posed to them and their families.  DuPont's misrepresentations and omissions, as detailed herein, ensured that consumers either entered into transactions to purchase Teflon® coated cookware that they would not otherwise have purchased had the truth about the Teflon® product been disclosed or else paid too high a price for the Teflon® coated cookware that they did purchase.

5.    This action is brought to require DuPont, *inter alia*, (i) to pay damages and/or restitution to the Plaintiff and other Class members who purchased cookware coated with DuPont's Teflon® product; (ii) to disgorge its ill-gotten profits from the sale of Teflon® as a cookware coating product; (iii) to create a fund for independent scientific

researchers to investigate further the potential for adverse health effects to persons who

have used cookware coated with the Teflon® product; and (iv) to enter an injunction

barring DuPont from continuing to license, design, manufacture, market, advertise, sell

and/or distribute its Teflon® product as a cookware coating or, alternatively, an

injunction requiring DuPont and its licensees to provide an adequate warning label,

disclosing the risks and hazards of the Teflon® product, on all Teflon® coated cookware

sold in the future.

## PARTIES

6.     Plaintiff Nahikian ("Plaintiff" or " Mr. Nahikian"), is an adult individual

who resides at 3818 Davis Place, Unit #103, Washington, D.C., 20008,  During the Class

Period, Plaintiff Nahikian purchased and used, within the District of Columbia, cookware

coated with DuPont's Teflon® product, manufactured by Mirro and Farberware.

7.     Defendant DuPont is a Delaware corporation.  DuPont designs,

manufactures, advertises, markets, sells, distributes and/or licenses the Teflon® product

for use in numerous consumer goods, including cookware, sold throughout the District of

Columbia and elsewhere.

## JURISDICTION & VENUE

8.     Jurisdiction of this Court is founded in D.C. Code § 11-921.

9.     This Court has subject matter jurisdiction pursuant to 28 U.S.C.A. §1332

(a)(1) and (d)(2) in that this action seeks monetary relief in excess of $5,000,000.00,

exclusive of interest, costs and attorneys' fees and is between citizens of different States.

10.     Venue is appropriate in this judicial circuit pursuant to 28 U.S.C. §1391

because a substantial part of the events or omissions giving rise to the claims occurred in

the District of Columbia. Defendant DuPont is subject to the jurisdiction of this Court

pursuant to the District of Columbia Deceptive Trade Practices Act, D.C. Code § 28-

3901, et seq. Defendant transacts business in this District and has caused injury within

the District.

## CLASS ACTION ALLEGATIONS

11.    This action is brought as a class action pursuant to Rule 23 of the Federal

Rules of Civil Procedure and pursuant to D.C. Code § 28-3901, et seq.

12.    The class consists of all persons in the District of Columbia who have

purchased cookware that was coated with, manufactured with, or contains Dupont's

Teflon® product and who were damaged thereby. This action does not assert personal

injury claims, such as claims related to the harmful physical effects that result from any

class member's use of the cookware. Rather, this action asserts claims stemming from

class members' purchase of the Teflon® product from the Defendant, and Defendant's

deceptive acts and practices in conjunction with the marketing, sale and/or lease of the

Teflon® coated cookware. Plaintiff and the Class seek economic and related equitable

relief. Plaintiff is a member of this Class.

13.    Although the exact number of Class members is presently unknown to

Plaintiff, it is estimated that the Class consists of at least thousands of persons in the

District of Columbia. Joinder of all members is therefore impracticable.

14.    There are questions of law or fact common to the members of the Class

which predominate over any questions affecting only individual members and which

make class certification appropriate in this case, including:

    a.    Whether the Class members purchased an item of cookware containing

DuPont's Teflon® product;

b.   Whether DuPont represented to the public that its Teflon® product, or the use of cookware coated with Teflon®, was safe;

c.   Whether DuPont has denied that its Teflon® product, or the use of cookware coated with Teflon®, can be potentially harmful to human health;

d.   Whether DuPont had in its possession, or knew of, animal or human test data indicating potential adverse health effects, from one or more of the chemicals or compounds found in its Teflon® product, which DuPont failed to disclose to the consuming public or about which DuPont failed to issue adequate warnings to the consuming public;

e.   Whether DuPont had in its possession, or knew of, blood sample test results of DuPont workers indicating transplacental movement of one of more of the chemicals or compounds found in its Teflon® product, which DuPont failed to disclose to the consuming public or about which DuPont failed to issue adequate warnings to the consuming public;

f.   Whether DuPont had in its possession, or knew of, data regarding deformities suffered by the children of female DuPont employees exposed to one or more of the chemicals or compounds in its Teflon® product, which DuPont failed to disclose to the consuming public or about which DuPont failed to issue adequate warnings to the consuming public;

g.   Whether DuPont had in its possession, or knew of, information or data demonstrating or tending to demonstrate that PFOA present in its Teflon® product may present a variety of risks of injury to human health - including, *inter alia*, cancer, tumors,

organ damage, changes in blood chemistry, and vascular disease - which DuPont failed to disclose to the consuming public or about which DuPont failed to issue adequate warnings to the consuming public;

  h. Whether the EPA advised DuPont that evidence of transplacental movement of PFOA, a component of the Teflon® product, in laboratory rats was "substantial risk data" that DuPont failed to disclose to the consuming public or that DuPont failed to issue adequate warnings to the consuming public about;

  i. Whether DuPont knew or should have known that the heating of cookware coated with its Teflon® product can cause the release of substances, including without limitation PFOA, which are harmful or potentially harmful to human health;

  j. Whether DuPont had in its possession information or data, which DuPont failed to disclose to the consuming public or about which DuPont failed to issue adequate warnings to the consuming public, demonstrating or tending to demonstrate that the heating of cookware coated with its Teflon® product can cause the release of substances, including without limitation PFOA, that are harmful or potentially harmful to human health;

  k. Whether DuPont knew or should have known that fumes from heated cookware coated with its Teflon® product can potentially sicken people;

  l. Whether DuPont had in its possession information or data, which DuPont failed to disclose to the consuming public or about which DuPont failed to issue adequate warnings to the consuming public, demonstrating or tending to demonstrate that fumes from heated cookware coated with its Teflon® product can sicken people; and

  m. To what extent Class members have suffered damages and the proper

measure of damages.

15. The claims asserted by Plaintiff are typical of the claims of the members of the Class.

16. Plaintiff is a member of the Class and will fairly and adequately protect the interests of the members of the Class; her interests are not antagonistic to those of the Class; and she has retained attorneys experienced in class and complex litigation as her counsel.

17. A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

(a)    It is economically impractical for most members of the Class to prosecute separate, individual actions, and

(b)    After the liability of Defendant has been adjudicated, damages to members of the Class can be determined by the Court.

18. Litigation of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to the individual Class members which would substantially impair or impede the ability of other Class members to protect their interests.

19. Class certification is also appropriate because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate declaratory and/or injunctive relief with respect to the claims of plaintiff and the Class members.

**INDUSTRY BACKGROUND**

20. Many consumer products, such as non-stick cookware and breathable, all-

weather clothing, are made with perfluorooctanoic acid ("PFOA"). PFOA is a synthetic (man-made) chemical that does not occur naturally in the environment. PFOA (also known as "C-8" or "C8") is a perflourinated detergent/surfactant that is manufactured, processed and/or distributed by DuPont in connection with its manufacture of the Teflon® product.

21.    One of the most widely known compounds made using PFOA is polytetrafluoroethylene ("PTFE"). The Teflon® product is DuPont's trademarked name for its PTFE product. DuPont is the sole United States manufacturer of PTFE products. According to DuPont's website, the only United States plant that manufactures PFTE is located in Parkersburg, West Virginia.

22.    PFOA is the chemical used to give DuPont's Teflon® product its legendary "non-stickiness."

23.    DuPont was founded in 1802 and is now the second largest chemical company in the world with operations in more than seventy (70) countries.

24.    The Teflon® product was invented in 1938 at DuPont's Jackson Laboratory and first began selling commercially in 1946. The Teflon® product became a popular component of cookware in the 1960s.

25.    DuPont has registered the Teflon® trademark in 19 countries. DuPont is a member of the American Chemistry Council (ACC), a trade association that markets U.S. trade companies and lobbies members of Congress.

26.    DuPont's Teflon® product and the chemicals used in its production together represent a $2 billion per year industry.

27.    DuPont nets an estimated $200 million per year from its sale of the Teflon® product.

28.    In 2005, JP Morgan analyst Jeffrey J. Zekauskas estimated that "DuPont's fluoropolymers and telomers products contributed about $1.23 billion to 2003 sales and $100 million to profit."

29.    The Teflon® product imparts non-stick properties to a wide variety of cooking aids routinely heated to very high temperatures. DuPont's Teflon® product is commonly used as a cooking surface coating in "non-stick" cookware, such as in pots and pans, stir fryers and woks, pizza pans, breadmakers, cookie sheets, griddle pans and skillets, wafflers, deep fryers, crock pots, roasting pans, cake pans and molds, and other common cooking utensils and aids.

30.    52% of cookware sold in the United States in 2001 is non-stick. Statistics reported by the Cookware Manufacturers Association indicate that 90 percent of all the aluminum cookware sold in the United States in 2001 was coated with non-stick chemicals like the Teflon® product.

31.    As DuPont proudly boasts in its Teflon® website, www.teflon.com:

> Teflon® is really everywhere. Not only can you find it
> in your clothes and on your cookware, but you can also
> find it on products on almost every continent.[1]

32.    DuPont has advertised and represented to the public that the Teflon® product makes life easy, and reportedly has called Teflon® a "housewife's best friend."

33.    According to Dupont's Teflon website: "There have been billions of

---

[1] *See* http://www.teflon.com/NASApp/Teflon/TeflonPageServlet?pageId=/consumer/na/eng/ brandWorld/regional_product_list.html.

cookware products coated with Teflon® non-stick coating sold around the world over the past 40 years."

34.    DuPont claims on its Teflon® website, www.teflon.com, that "the Teflon brand is one of the world's most recognized and respected" brands and has strong consumer recognition.

35.    During the last fifty (50) years, DuPont's scientists have studied whether products containing the Teflon® product are safe for use by consumers. DuPont has represented to consumers in public statements and documents, in press releases and on its websites that the Teflon® product is safe for consumer use and has denied that the use of cookware coated with its Teflon® product can be harmful to human health.

36.    DuPont's Teflon® website, www.teflon.com, is replete with statements touting the safety of Teflon® coated cookware, such as "Cookware made with Teflon® non-stick coating is totally safe for everyday use."[2]

37.    DuPont has backed such claims with boasts, such as the following, of its decades of quality assurance and testing work concerning cookware that is coated with its Teflon® product:

> DuPont certification seal means you can trust cookware to meet the toughest DuPont standards for quality and performance. Standards are upheld by a unique 13-point checklist for quality assurance. Plus, DuPont tests cookware in a rigorous battery of real-world tests, including over 30 years of in-home kitchen testing and an ongoing program of professional chef testing conducted in commercial restaurants.[3]

---

[2] *See, e.g.*, http://www.teflon.com/Teflon/downloads/pdf/facts_about_teflon.pdf.

[3] *See, e.g.*, http://www.teflon.com/NASApp/Teflon/TeflonPageServlet?...ookware/cookware/nonStick/howDoesIt/cons_how_work.html.

38.    In addition, DuPont has represented to consumers that it retains oversight and control of the use of its Teflon® product by licensees who wish to combine it with their cookware products. For example,

> Before a manufacturer is licensed to use a DuPont non-stick coating, they must submit their products to DuPont to make certain that exacting quality standards are met. Once a manufacturer is licensed, DuPont conducts periodic testing to ensure that those standards are consistently upheld. Finally, each manufacturer conducts in-house tests against their own quality standards.[4]

39.    DuPont has knowledge of all licensees authorized to manufacture or sell cookware coated with or otherwise incorporating its Teflon® product and knowledge of the brand and model names so marketed. Upon information and belief, and subject to information obtainable only through pre-trial discovery, DuPont has licensed the use of the Teflon® product for use by, *inter alia*, the following manufacturers and/or models of cookware:

| Manufacturer | Models |
|---|---|
| All Clad | Emerilware<br>LTD<br>Cop-R-Chef<br>Copper-Core<br>MC2 |
| Analon | Analon Titanium<br>Advanced<br>Classic<br>Professional<br>Suregrip Bakeware |
| Basic Essentials | |
| Bodum | |
| Chef's Planet | Arc-42 Cookware<br>Tefmat Oven & Bake Liners |
| Circulon | Circulon Total |

---

[4] *Id.*

|  | Elite<br>Premier<br>DuPont Autograph<br>Circulon Electrics |
|---|---|
| Cresware | DuPont "Supra Select"<br>Platinum Pro<br>Silverstone Xtra<br>Silverstone Professional |
| Cuisinart | Chef's Classic |
| DuPont | Autograph<br>Platinum Pro<br>Platinum Select<br>Xtra<br>Classic |
| Farberware | Farberware, Inc.<br>Farberware Millennium<br>Farberware Nonstick Aluminum<br>Restaurant Pro<br>Enhanced Nonstick Cookware Select<br>Vibrance<br>Cooks Kitchen<br>Classic Series Nonstick Skillets<br>Farberware Nonstick Bakeware |
| GAU | |
| GSI | Bugaboo |
| **Manufacturer** | **Models** |
| Kitchenaid | Gourmet Excellence<br>Gourmet Essentials |
| Megaware Inc. of<br>California | Castalon<br>Castame<br>Triomphe<br>Concorde<br>Magnifica |
| Newell Rubbermaid | Calphalon |
| Royal Cougar | |
| Salton | |

| Silverstone | Culinary Colors Series<br>Nonstick Stainless Steel Series |
|---|---|
| T-Fal | Jamie Oliver Cookware |
| US Foodservice | Next Day Gourmet |
| Wearever | Mirro<br>Regal<br>Wearever |

## HISTORY OF MEDICAL AND SCIENTIFIC RESEARCH

40.    DuPont has conducted both animal and human studies and tests on PFOA. In addition, DuPont had knowledge of studies and tests conducted by others, including 3M, another manufacturer of PFOA.

41.    PFOA is associated with health concerns in animals, including cancer and developmental defects.

42.    There are numerous facts and studies that demonstrate that exposure to PFOA causes adverse health effects.  PFOA has been linked to cancer, organ damage and other negative health effects in tests on laboratory animals.  For example, male and female rats and mice have developed several different kinds of tumors when exposed to PFOA.

43.    Studies have indicated that PFOA causes developmental toxicity and other adverse effects in animals.

44.    Studies dating from the 1950s have allowed DuPont the knowledge that the Teflon® product can release fumes at relatively low temperatures that can cause acute illness known as "Polymer Fume Fever."

45.    In the 1960s, DuPont's scientists speculated that smokers are more susceptible to polymer fume fever than the general population because particles of the Teflon® product from workers' fingers decomposed within burning cigarettes. However, no studies have been conducted examining the link because smoking and the general use of Teflon coated cookware.

46.    In the 1960s, DuPont conducted human experiments with Teflon®-laced cigarettes to determine why certain workers were becoming sick on the job with a Teflon®-related illness commonly called Polymer Fume Fever. DuPont laced the cigarettes of its volunteers with the Teflon® product and had the volunteers inhale the cigarette fumes until they became sick. In these dosing experiments up to 90% of the people in the highest dose group became ill for an average of 9 hours, demonstrating flu-like symptoms, including chills, back ache, fever and coughing - symptoms commonly linked to Polymer Fume Fever.

47.    Moreover, apparently aware of the adverse effects in humans of inhaling heated particulates or fumes emitted by the Teflon® product, DuPont required its employees to wear respirators when working with the Teflon® product heated to 400°F (or more) while in poorly ventilated areas. Experiments demonstrate that when cooking in the home, the surface of a Teflon® coated pan can reach this temperature within *2 minutes* using a conventional stove top burner set on high.

48.    400°F is well below the maximum cooking temperature of 500°F recommended on DuPont's website. Teflon coated pans can reach 400°F in just two minutes on a stovetop set on "High", according to experiments by the Environmental

Working Group. Electric coils on range tops can reach 800°F, while gas range temperatures can hit 1000°F.

49.    The toxic particles and gases emitted when the Teflon® product heats and the temperatures at which these particles and gases are first emitted, follow:

464°F – Ultrafine particulate matter: The Teflon® product produces very small (ultrafine) particles which cause extreme lung damage to rats within 10 minutes of exposure. Longer exposure causes death.

680°F – Tetrafluoroethylene (TFE): The National Toxicology Program considers *tetrafluoroethylene* (TFE) to be a "reasonably anticipated" human carcinogen because it is known to cause cancer in laboratory animals. Carbonyl fluoride is the fluorine version of phosgene, a chlorinated chemical warfare agent. Carbonyl fluoride fumes can irritate eyes, ears and nose. More serious symptoms of exposure include chest pains, breathing difficulty, fluid accumulation in the lungs, weakness, liver damage and increased glucose levels.

680°F – Hexafluoropropene (HFP): Exposure to fluorocarbons like HFP can lead to eye, nose and throat irritation; heart palpitations, irregular heart rate, headaches, light-headedness, fluid accumulation in the lung and possibly death. Long-term exposure is associated with decreased motor speed, memory and learning. In mice and rats, inhalation of hexafluoropropene (HFP) causes kidney lesions, decreased numbers of a type of immune cell and increased urination. HFP also causes increased numbers of chromosomal abnormalities in hamster ovaries.

680°F – Difluoroacetic acid (DFA): Kidney toxicity from DFA has been reported in rats.

680°F – Monofluoroacetic acid (MFA, fluoroacetic acid or compound 1080): Monofluoroacetic acid is toxic. Doses as low as 0.7 to 2.1 mg/kg can kill people. Initially, people report nausea, vomiting, numbness, tingling, anxiety, muscle twitching, low blood pressure and blurred vision. If exposure is high enough, people can have irregular heart rate, heart attacks and severe convulsions leading to respiratory failure.

680°F – Perfluorooctanoic acid (PFOA): The effects of PFOA are discussed throughout this Complaint.

878°F – Silicon tetrafluoride (SiF4): Silicon tetrafluoride is a highly toxic, corrosive gas. In the lungs, moisture causes the silicon particles to separate, releasing toxic hydrofluoric acid and also coating the lung with silicon particles. Inhaling hydrofluoric acid can cause eye and throat irritation, cough, difficult breathing, bluish skin color caused by lack of oxygen, lung damage and fluid accumulation in the lung. Long term exposure can cause weight loss, decreased numbers of red and white blood cells (anemia and leucopenia), discoloration of the teeth and abnormal thickening of the bone.

887°F – Perfluoroisobutene (PFIB): Perfluoroisobutene (PFIB) is toxic. Inhalation can lead to fluid build up in the lung, a condition that can lead to death. PFIB is listed in the Chemical Weapons Convention as a *Schedule 2 compound*. PFIB is many times more toxic than phosgene, a highly toxic corrosive gas also listed as a chemical weapon.

932°F – Carbonyl fluoride (COF2): Breakdown of the Teflon® product in the air is the major source of carbonyl fluoride exposure.

932°F – Hydrogen fluoride (HF): Hydrogen fluoride (HF) is a toxic corrosive gas, and can cause death to tissue it comes into contact with, including tissue in the lungs. Breathing HF can cause severe lung damage, such as fluid buildup in the lungs and inflammation of lung passages.

1112°F – Trifluoroacetic acid fluoride (CF3COF): Trifluoroacetic acid fluoride is toxic when it breaks down into hydrogen fluoride and trifluoroacetic acid.

1112°F – Octafluorocyclobutane (OFCB): Inhaling high levels of octafluorocyclobutane can cause heart beat irregularities, unconsciousness and death. People with pre-existing heart conditions may be extra vulnerable.

50.    Reports indicate that a Teflon® coated pan reached 721°F in just five

minutes. DuPont studies show that the Teflon® product emits toxic particulates at 446°F. At 680°F Teflon® coated pans release at least six toxic gases, including two carcinogens, two global pollutants, and MFA, a chemical lethal to humans at low doses. At temperatures that DuPont scientists claim are reached on stovetop drip pans (1000°F), Teflon® non-stick coatings break down to a chemical warfare agent known as PFIB, and a chemical analog of the WWII nerve gas *phosgene*.

51.   In 1981, 3M advised DuPont that PFOA may cause birth defects in laboratory animals.

52.   Also in 1981, DuPont possessed a document describing the results of a blood sampling study DuPont conducted on eight (8) of its pregnant employees at the plant where PFOA is manufactured. This document identified the levels of PFOA in the blood of DuPont's pregnant employees and described the status of the child.

53.   A purpose of DuPont's blood sample study was to monitor these pregnant employees for PFOA exposure, to monitor umbilical cord blood for the presence of PFOA, and to test the babies' blood for the presence of PFOA.

54.   The 1981 document demonstrates the presence of PFOA in the umbilical cord blood of at least one of the eight (8) DuPont employees and in the blood of another worker's baby. Thus, DuPont knew or should have known from this study that PFOA moved from the mother, through the placenta, to the fetus.

55.   In 1982, DuPont reported data to the EPA regarding the transplacental movement of PFOA in rats. The EPA considered this information to be "substantial risk data." DuPont failed to disclose to the EPA, however, both its possession of human blood sampling data from 1981 that confirmed the transplacental movement of PFOA in

humans and the information it had about the presence of birth defects (described below) in the babies of its female workers exposed to PFOA.

56.    PFOA is nonetheless now found to contaminate the blood of humans in all geographic regions of the United States.  For example, a 2001 study by 3M Corporation found that PFOA was present in the blood of ninety six percent (96%) of the 598 children tested. The children were located in 23 states.

57.    A recent study by the Centers for Disease Control showed that PFOA has contaminated the bloodstream of fetuses throughout the United States.

58.    The EPA contends that DuPont's human blood sampling information demonstrating the transplacental movement of PFOA "reasonably supports the conclusion that PFOA presents a substantial risk of injury to human health."

59.    More specifically, the EPA contends that DuPont's human blood sample data demonstrating that PFOA crosses the human placental barrier between PFOA exposed mothers and their fetuses suggests that the fetuses could experience toxic effects from PFOA, including bioaccumulation and, as observed in animal tests, developmental toxicity and liver toxicity.

60.    The EPA considers DuPont's human blood sampling information that confirms transplacental migration of PFOA "to reasonably support the conclusion of a substantial risk of injury to health or to the environment."

61.    Moreover, the EPA considers DuPont's blood sample data confirming the transplacental movement of PFOA to be "known toxicological information" about PFOA of which DuPont was aware.

62.    Additionally, documents maintained by DuPont chronicling the health of

babies born to DuPont workers exposed to PFOA indicate birth defects in two (2) of seven (7) babies. One child had eye and tear duct defects and the second had nostril and eye defects.

63.    A recent study by Johns Hopkins University researchers found PFOA in the cord blood of 99% of newborn infants.

64.    The Environmental Protection Agency's ("EPA") website states: "[S]tudies have shown that PFOA exposure can result in a variety of toxic effects in animals including liver toxicity, developmental toxicity, and immunotoxicity."

65.    The EPA further states that "PFOA is persistent in the environment. It will continue to accumulate as long as it is produced."

66.    Teflon® coated pans heated to an excess of 400ºF cause "acute, severe toxicosis in pet birds … the condition is generally a rapidly fatal one." *See* "Inorganic Compounds that Affect the Lungs", Veterinary Toxicology, V. Beasley, August 9, 2005, http://www.ivis.org/advances/Beasley/ Cpt15a/IVIS.pdf.

67.    Various studies have confirmed that exposure to PFOA causes or may cause vascular disease in humans. For example, it is reported that workers exposed to PFOA at 3M's plant in Cottage Grove, Minnesota demonstrated a statistically significant, elevated risk of dying from cerebrovascular disease. Findings of vascular disease have also been reported in a study of DuPont workers exposed to PFOA. Additionally, DuPont's study of the blood of its workers demonstrates a statistically significant correlation between cholesterol and PFOA. Similarly, there was also a statistically significant correlation between cholesterol and PFOA found in a study of Italian workers exposed to PFOA.

68.    Moreover, there are animal studies showing changes in blood chemistry associated with PFOA exposure that bolster these human study results.

69.    Studies have also shown that exposure to PFOA correlates to incidences of prostate cancer in humans. For example, workers at 3M's Cottage Grove plant exhibited a statistically significant association between the length of workplace PFOA exposure and prostate cancer mortality. Moreover, an elevated risk of dying from prostate cancer was found among certain workers exposed to PFOA. Workers at 3M's Decatur, Alabama plant exhibited an increase in demand for medical care for male reproductive cancers (including prostate) compared to the general population, with the greatest increases among those workers in the long-time, high-PFOA-exposure category.

70.    There are numerous other studies demonstrating many potential health risks related to exposure to PFOA. Some of these studies include:

a.    Two analyses of leukemia incidence were conducted from 1956-1989 showing statistically increased odds ratios for workers in DuPont's Washington Works plan from 1956-1989. Additionally, a general mortality study found an increase in leukemia.

b.    Workers exposed to perfluorochemicals at 3M's Decatur, Alabama plant exhibited significantly increased numbers of episodes of care for intestinal tumors versus those not exposed occupationally. An elevated increase of risk of dying from cancer of the large intestine was also seen in those exposed to PFOA in 3M's Cottage Grove, Minnesota plant compared to the general population.

c.    At 3M's Cottage Grove, Minnesota plant an elevated risk of dying from pancreatic cancer or pancreatic disease was seen among workers exposed to PFOA

versus those not exposed occupationally.

  d. At 3M's Cottage Grove, Minnesota plant an elevated risk of dying from cancer of the testis or other male reproductive cancers was seen among workers exposed to PFOA versus those not exposed occupationally.

  e. A 3M-sponsored animal study found a statistically significant increase in fibroademonas (mammary tumors) correlated with PFOA dose.

  f. There are also studies that demonstrate PFOA may be related to adverse pituitary effects and immunological function.

  71. There is evidence that PFOA causes birth defects in animals, especially eye defects.

  72. Rats and mice exposed to PFOA develop frequently develop tumors of the reproductive organs, liver and pancreas.

  73. A study by DuPont in early 2005 that examined 1,000 employees from its Washington Works facility in West Virginia found a 10% increase in total cholesterol in workers with high concentrations PFOA in their blood. The cholesterol increase came primarily from an increase in LDL cholesterol, while HDL level remained unchanged.

  74. Similar results had been observed in a longitudinal study of Italian workers exposed to PFOA. *See* Report by Giovanni Costa describing a meeting with 3M and DuPont, August 23, 2004.

  75. Other evidence of the health effects of PFOA includes a study by 3M that showed that workers present in the manufacture of Teflon products faced a chance of dying of stroke that was fifteen times the risk faced by unexposed workers. This suggests that PFOA exposure contributes to vascular disease. *See* "Mortality study of workers

employed at the 3M Cottage Grove Facility. Final Report." Division of Environmental

and Occupational Health, School of Public Health, University of Minnesota Alexander,

B. 2001. AR 226-1136. Washington, DC, U.S. Environmental Protection Agency.

76.    The EPA is even now continuing its risk assessment process for PFOA.  On

June 27, 2005, a panel of the EPA's Science Advisory Board ("SAB") released a draft of

its conclusions after reviewing the EPA's report entitled "Draft Risk Assessment of the

Potential Human Effects Associated with Exposure to Perfluorooctanoic Acid (PFOA)".

In the draft report, the majority of members on a scientific advisory board that reviewed

the EPA's draft risk assessment concluded that PFOA is "likely" to be a human

carcinogen, a finding that went *beyond* the EPA's determination that there was

"suggestive evidence" from animal studies that PFOA and its salts are potentially

carcinogenic in humans.  The SAB stated:

> That the experimental weight of the evidence with respect to the
> carcinogenicity of PFOA was stronger than [previously determined by the
> EPA], and suggested that **PFOA is a 'likely' carcinogen in humans**.
> According to the EPA's Guidelines for Carcinogen Risk Assessment (also
> known as EPA's Cancer Guidelines), this descriptor is typically applied to
> agents that have tested positive in more than one species, sex, strain, site
> or exposure route, with or without evidence of carcinogenity in humans.

(Emphasis added).

## DEFENDANT'S MISCONDUCT

77.    DuPont at all times relevant did not disclose to consumers any of the

preceding studies, tests, or data discussed herein.

78.    DuPont at all times relevant did not issue warnings to cookware consumers

setting forth the risks and dangers of the Teflon® product, PFOA, or the other chemicals

found in Teflon® coated cookware, as discussed herein.

79.   DuPont at all times relevant did not instruct or require that its Teflon®
product licensees, who manufacture the cookware onto which DuPont's Teflon® product
is applied, issue warnings to cookware consumers setting forth the risks and dangers of
the Teflon® product, PFOA, or the other chemicals found in the Teflon® product, as
discussed herein.

80.   Instead, DuPont has continually represented to consumers in public
statements and documents, in press releases and on its websites that there is no danger
posed by PFOA when using cookware coated with its Teflon® product and has denied
that the use of Teflon® coated cookware can be harmful to human health.

81.   DuPont likewise has continuously claimed that the use of its Teflon®
product as a cookware coating is completely safe.

82.   DuPont's website assures consumers that they cannot be exposed to PFOA
by heating pans with non-stick coating.  "There is no significant potential for exposure to
PFOA from using products made with DuPont materials; hence, there is no risk to
consumers."

83.   For the past fifty years DuPont has claimed that its Teflon® product, when
used as a cookware coating, does not emit hazardous chemicals through normal use.  In a
recent press release, DuPont wrote that "significant decomposition of the coating will
occur only when temperatures exceed about 660°F (340°C).  These temperatures alone
are well above the normal cooking range."  Reported tests show, however, that Teflon®
coated cookware exceeds these temperatures through the common act of preheating a pan
on a burner set on high.

84.    DuPont failed to release internal records that recording blood PFOA levels of its employees.  DuPont said in a 2004 statement that it was not required to disclose the results of its tests because the trace amounts posed no "substantial risk of harm" to humans.

85.    In a July 2005 statement responding to a separate class-action lawsuit DuPont asserted "Consumers using products sold under the Teflon brand are safe."

86.    DuPont's January 2006 response to a recommendation by the EPA's Scientific Advisory Board, again denies that PFOA is not a health risk:  "The weight of evidence indicates that PFOA exposure does not pose a health risk to the general public," said Dr. Robert Rickard, DuPont Director of Health and Environmental Sciences,  "In over 50 years of working with PFOA, there is no association of cancer in workers who handle or use PFOA."

87.    Further, in May, 2005, a federal grand jury from the Justice Department's Economic Crimes Section issued a subpoena to DuPont regarding DuPont's use of PFOA.

88.    While DuPont and industry scientists have studied the possible health risks associated with the manufacture and use of the Teflon® product since the substance's introduction, the company publicly maintains that "Teflon® is Safe" and that the use of Teflon non-stick cookware poses absolutely no risk to human health.

89.    As late as 2001, DuPont maintained that "[f]umes from overheated non-stick coatings are no more harmful to people than fumes from overheated cooking fats, such as oil, butter or margarine."  It has since removed this comparison from its website.

90. DuPont failed to report the results of mainly of its own studies of PFOA to the government and the public.

91. DuPont's concealment of its 1981 blood sample study information protected the continued commercialization and marketability of DuPont's Teflon® product and the profits received by DuPont from Teflon® product sales. As the EPA pointedly states in its complaint against DuPont contending that DuPont violated the Federal Toxic Substances Control Act from June 1981 to March 2001 by not reporting health risks from exposure to PFOA:

> [the EPA's efforts to investigate the risks posed by PFOA] might have been more expeditious had the data on transplacental movement of the chemical in humans been submitted immediately by DuPont when DuPont obtained the information in 1981.

92. DuPont has settled the claims brought by the EPA claiming it violated the Federal Toxic Substances Control Act and the Resource Conservation and Recovery Act by withholding information from the agency about the potential health and environmental risks of PFOA. As a condition of settlement, in December 2005, DuPont agreed to pay a combined $16.50 million, including $10.25 million in fines and $6.25 million for environmental projects (including a research program to evaluate the potential for biodegradation of chemicals such as PFOA). This $16.5 million fine is the largest fine ever levied on a company by the EPA. Discussing the DuPont settlement, Granta Nakayama, EPA's Assistant Administrator for Enforcement and Compliance, stated, "This sends a strong message that companies are responsible for promptly giving EPA risk information associated with their chemicals."

93.    After DuPont's settlement with the EPA, DuPont ran full-page advertisements in many major national newspapers in early February 2006 promoting non-stick cookware as "safe" and saying "there is no reason to stop using it."

94.    As of April 24, 2006, DuPont's Frequently Asked Question section of its website continues to deny any concerns over the safety of the Teflon® product:

> Q:    Can I get exposed to PFOA from cookware?
>
> A:    Using the testing methods developed and approved by the U.S. Food & Drug Administration (FDA), DuPont has concluded that consumers cannot be exposed to PFOA through cookware coated with Teflon® non-stick finishes.[5]
>
> Q:    How safe is my cookware?
>
> A:    Confidence in the safety and performance of DuPont non-stick coatings on cookware and housewares is based on more than 25 years of laboratory and use testing worldwide. Prior to market introduction, DuPont non-stick coatings were subjected to exhaustive studies at the Haskell Laboratory for Toxicology and Industrial Medicine. The US Food and Drug Administration (FDA) has found them acceptable for conventional kitchen use. In addition, other health regulatory agencies throughout the world have approved the use of DuPont non-stick coatings on cookware and housewares. To date, cooks in more than 40 countries around the world have purchased over 2 billion pots and pans with DuPont non-stick coatings for home and commercial use. In all of this experience, there has been no record of serious or chronic, or acute health problems.[6]

95.    As of April 25, 2006, DuPont continued to deny the risks posed by the Teflon® product to the consumers on its website:

---

[5] http://teflon.custhelp.com/cgi-bin/teflon.cfg/php/enduser/std_adp.php?p_sid=j7RDSQ5i&p_lva=&p_faqid=104&p_created=1100891126&p_sp=cF9zcmNoPSZwX2dyaWRzb3J0PSZwX3Jvd19jbnQ9MjkmcF9wYWdlPTI*&p_li=

[6] http://teflon.custhelp.com/cgi-bin/teflon.cfg/php/enduser/std_adp.php?p_sid=j7RDSQ5i&p_lva=&p_faqid=52&p_created=1035388627&p_sp=cF9zcmNoPSZwX2dyaWRzb3J0PSZwX3Jvd19jbnQ9MjkmcF9wYWdlPTI*&p_li=

**Studies using FDA standard testing methods found no detectable level of PFOA in Teflon® non-stick cookware.**

**A published, peer-reviewed study (April 2005) in Environmental Science & Technology** [.pdf] found no PFOA in Teflon® cookware. No PFOA was detected even when the cookware was scratched with a knife. Studies using FDA standard testing methods also found no detectable levels of PFOA in non-stick coatings used for cookware sold under the Teflon® brand. The Danish Technical Institute and China Academy of Inspection and Quarantine tested Teflon® cookware and did not detect PFOA.

However, according to a recently published study conducted by researchers at the U.S. Food & Drug Administration (FDA), PFOA was detected in minute quantities in cookware using extreme and abusive test methods--methods that do not reflect what happens when consumers use cookware. The quantities of PFOA detected through these extreme measures were too small to measure migration of the PFOA out of the cookware. Published, peer-reviewed research clearly shows that cookware is safe for consumer use.

**Consumers can use their cookware with complete confidence.**

**Not all non-stick coatings are branded Teflon®.**

Teflon® branded non-stick coatings are made solely by DuPont. Teflon® is a registered trademark. Not all non-stick coatings are branded Teflon®. Moreover, a stringent certification program ensures that non-stick coatings by DuPont are used only in suitable applications.

**All Teflon® branded products are safe for their intended consumer and commercial use.**

http://www.teflon.com/NASApp/Teflon/TeflonPageServlet?pageId=/cons

umer/na/eng/news/news_detail.safetyconcerns.html (emphasis in original).

<u>COUNT I</u>
**(Violation of D.C. Consumer Protection Procedures Act)**
**(D.C. Code §28-3901, <u>et seq</u>)**

96.    Plaintiff incorporates by reference all the paragraphs in this complaint as if fully restated herein.

97.    This cause of action is brought pursuant to the District of Columbia Consumer Protection Procedures Act, D.C. Code § 28-3901, <u>et seq</u> ("DC CPPA").

98.    D.C. Code § 28-3904 of the DC CPPA indicates that it is a violation, whether or not any consumer is in fact misled, deceived or damaged thereby, to:

    a.   represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have; .

    d.   represent that goods or services are of particular standard, quality, grade, style, or model, if in fact they are of another;

    e.   misrepresent as to a material fact which has a tendency to mislead;  or

    f.   fail to state a material fact if such failure tends to mislead;

99.    At all times relevant hereto, Plaintiff and members of the Class were "persons" within the meaning of D.C. Code §28-3901(1) and are entitled to relief pursuant to the statute in accordance  with D.C. Code §28-3904.

100.    At all times relevant hereto, Defendant was  a  "merchant" as defined by D.C. Code §28-3901(3).

101.    Defendant's conduct as described herein was a false and deceptive trade practice within the meaning of the DC CPPA in that Defendant, among other things, made representations and/or omissions regarding the potential risks associated with

Teflon® which had the capacity tendency, or effect of deceiving Plaintiff and the Class; and failed to state material facts regarding these risks, the failure of which deceived or tended to deceive Plaintiff and the Class.

102.    Plaintiff and the members of the Class entered into consumer transactions to purchase cookware coated with Defendant's Teflon® product.

103.    Defendant's false statements in the District of Columbia, contained in its advertising, marketing, and website media, that cookware items coated with its Teflon® product were "safe" and were quality controlled through "rigorous" "testing," and other similar false statements by Defendant, could reasonably be found to have caused consumers to act differently than they would have acted in the absence of such statements.

104.    Likewise, Defendant's failure to disclose and to warn against the risks and dangers of its Teflon® product, as alleged herein, could reasonably be found to have caused consumers to act differently than they would have if presented with complete and truthful disclosures and warnings of the Teflon® products's risks and dangers, in which case they may not have entered into their transactions to purchase Teflon® coated cookware.

105.    As a direct and foreseeable result of Defendant's conduct, Plaintiff and the Class have been injured by paying for cookware that did not comport to the description of the product as offered by Defendant.

106.    Defendant's violations of the implied warranties set forth in D.C. Code §§ 28:2-314 and 28:2-315, as alleged herein, constitute additional grounds in support of a finding that Defendant has violated the DC CPPA.

107. Defendant's acts, practices, and conduct, as outlined herein, were willful and knowing violations of the DC CPPA and invaded the rights of the Plaintiff and the Class to be free from deceptive and unfair business practices.

108. As a direct and proximate result of Defendant's violations, Plaintiff and the members of the Class are entitled to judgment under D.C. Code § 28-3901, et seq., (i) awarding triple the amount of such actual damages as they may prove or $1,500 per violation, whichever is greater, (ii) allowing for punitive damages, (iii) allowing for attorney's fees, (iv) allowing for an injunction against Defendant's use of their unlawful trade practices, (v) allowing for the creation of a fund for independent scientific researchers to investigate further the potential adverse health effects to persons who have used cookware coated with the Teflon® product, and (vi) requiring Defendant to refund all sums Plaintiff and the members of the Class paid to purchase cookware coated in Defendant's Teflon® product in the District of Columbia during the Class Period or to disgorge all profits which Defendant made on account of such Teflon® coated cookware sales to Plaintiff and the members of the Class in the District of Columbia during the Class Period.

109. Defendant continues to market the Teflon® product in the fashion described herein, and their conduct, if allowed to continue, would cause damages to purchasers like Plaintiff and the Class members.

## COUNT II
### (Breach of the Implied Warranty of Merchantability Under D.C. Code § 28:2-314)

110. Plaintiff repeats and realleges each and every allegation set forth above.

111.  As manufacturer and seller of the Teflon® product, Defendant as a matter of law warrants that its Teflon® product is merchantable and fit for the ordinary purposes for which such goods are used.

112.  As alleged herein, one or more defects or unreasonably dangerous conditions existed at the time the Teflon® product left the Defendant's hands, so that the Teflon® was not reasonably suitable for the ordinary uses, i.e. as a safe cookware coating, for which goods of that kind were sold.  The Teflon® product, as alleged herein, is an unsafe cookware coating product, which through normal use can expose consumers to toxic and harmful chemicals, particulates, and gases.  These defective and dangerous characteristics distinguish the Teflon® product from other products intended to be used as cookware coatings.

113.  In addition, Defendant failed to provide Plaintiff and the Class members with an adequate warning regarding its Teflon® product, i.e. one that would have sufficiently alerted those who may be sensitive to the Teflon® product and would have allowed the Teflon® product's users to balance its risk of harm against its social utility as a cookware coating.

114.  Plaintiff and the members of the Class have purchased cookware containing the Teflon® product as a cooking surface coating for use in a manner that the Defendant intended or that could reasonably have been foreseen by the Defendant.

115.  By manufacturing and selling the Teflon® product containing one or more defects or unreasonably dangerous conditions, and by failing to adequately warn against those defects and conditions, Defendant has breached the implied warranty of

merchantability as set forth in D.C. Code § 28:2-314, thereby directly and proximately causing Plaintiff and the members of the Class to be injured.

116.    Further, by knowingly and intentionally failing to disclose and/or adequately warn against the risks of the Teflon® product that were known to Defendant, Defendant employed fraud and/or deceit in its in violation of the implied warranty of merchantability.

### COUNT III
**(Breach of the Implied Warranty of Fitness Under D.C. Code § 28:2-315)**

117.    Plaintiff repeats and realleges each and every allegation set forth above.

118.    As manufacturer and seller of the Teflon® product, Defendant as a matter of law warrants that its Teflon® product is merchantable and fit for the ordinary purposes for which such goods are used.

119.    As alleged herein, one or more defects or unreasonably dangerous conditions existed at the time the Teflon® product left the Defendant's hands, so that the Teflon® was not reasonably suitable for the ordinary uses, i.e. as a safe cookware coating, for which goods of that kind were sold.  The Teflon® product, as alleged herein, is an unsafe cookware coating product, which through normal use can expose consumers to toxic and harmful chemicals, particulates, and gases.  These defective and dangerous characteristics distinguish the Teflon® product from other products intended to be used as cookware coatings.

120.    In addition, Defendant failed to provide Plaintiff and the Class members with an adequate warning regarding its Teflon® product, i.e. one that would have sufficiently alerted those who may be sensitive to the Teflon® product and would have

allowed the Teflon® product's users to balance its risk of harm against its social utility as a cookware coating.

121.   Plaintiff and the members of the Class have purchased cookware containing the Teflon® product as a cooking surface coating for use in a manner that the Defendant intended or that could reasonably have been foreseen by the Defendant.

122.   By manufacturing and selling the Teflon® product containing one or more defects or unreasonably dangerous conditions, and by failing to adequately warn against those defects and conditions, Defendant has breached the implied warranty of merchantability as set forth in D.C. Code § 28:2-315, thereby directly and proximately causing Plaintiff and the members of the Class to be injured.

123.   Further, by knowingly and intentionally failing to disclose and/or adequately warn against the risks of the Teflon® product that were known to Defendant, Defendant employed fraud and/or deceit in its in violation of the implied warranty of merchantability.

## COUNT IV
### (Unjust Enrichment)

124.   Plaintiff incorporates by reference all the paragraphs in this complaint as if fully restated herein.

125.   Defendant has benefited by its receipt of profits from Plaintiff and other class members resulting from the unlawful conduct alleged herein.

126.   It would be inequitable for Defendant to be permitted to retain these benefits, which were conferred by Plaintiff and the Class, and which stemmed from Defendant's unlawful conduct.

127.    Plaintiff and members of the Class are entitled to the establishment of a constructive trust consisting of the ill-gotten profits paid to Defendant as a result of its unlawful conduct, and from which Plaintiff and the other Class members may make claims on a pro-rata basis.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff and the Class pray for judgment against Defendant as follows:

(a)    That the Court determine that this action may be maintained as a Class action and direct that reasonable notice of this action be given to the members of the Class;

(b)    That judgment be entered against Defendant and in favor of Plaintiff and the Class on all counts;

(c)    That Defendant be permanently enjoined from continuing in any manner the violations alleged in this Complaint;

(d)    That actual or treble damages be granted;

(e)    That rescissory damages be granted in that Plaintiff and the Class be permitted to return their Teflon® coated cookware for a full refund;

(f)    That monetary damages be granted according to proof, and that Plaintiff and the Class be awarded, where appropriate, treble damages or statutory damages, punitive damages, reasonable attorneys' fees and expenses, costs and/or disbursements;

(g)    That equitable relief be awarded in a declaration that Defendant's conduct described herein constitutes violations of applicable statutory and common law in the District of Columbia;

(i)     That equitable relief be awarded in revised public warning and statements regarding the scientific debate regarding the potential risks of using the Teflon® product;

(j)     That the Court establish a constructive trust comprised of Defendant's ill-gotten profits from which Plaintiff and the Class may make claims;

(k)     That Plaintiff and the Class be awarded pre- and post-judgment interest; and

(l)     That Plaintiff and the Class have such other and further relief as the Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiff demands a jury trial as to all issues triable by a jury.


Dated:  April 27, 2006          By:     FINKELSTEIN, THOMPSON & LOUGHRAN

Mila Bartos (#464227)
The Duvall Foundry
1050 30th Street, N.W.
Washington, DC   20007
(202) 337-8000
(202) 337-8090 fax

The William Miller Group, PLLC
William L. Miller (#443191)
3050 K Street, Suite 400
Washington, D.C. 20007
(202) 342-8416